# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DONNA STEWART, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 14-CV-195-JED-FHM |
| PHYSICIANS SUPPORT SERVICES, INC., | ) ) ) |
| Defendant. | ) ) |

## **OPINION AND ORDER**

**I.     Background**

In this employment discrimination action, the plaintiff, Donna Stewart, asserts claims under the Family and Medical Leave Act of 1993 (29 U.S.C. § 2601, *et seq.*) (FMLA) and Title VII, 42 U.S.C. 2000e, for alleged retaliation, interference with FMLA rights, and intentional infliction of emotional distress.

Stewart began her employment with the defendant, Physicians Support Services, Inc. (PSSI), on October 26, 2010. She was a Patient Services Representative in the cardiology clinic office. Her position involved checking-in patients, taking insurance information, and performing associated duties. Christine Adams, who managed several PSSI offices, was Stewart's manager.

Plaintiff took medical leave under the FMLA starting July 20, 2012 to have knee surgery, and she returned to work on August 13, 2012. After returning from knee surgery, Stewart claims that she continued to exercise intermittent leave for physical therapy, which ended on November 1, 2012. (Doc. 18-1 at 15 [Dep. p. 34]). In early November, 2012, in the presence of Kelley Dressler and Stewart, Susie Davis, who was a PSSI office coordinator, instructed a black co-worker, Lori Tallent, to stop using a hallway leading to patient rooms. Stewart alleges that this

directive was racist, and that she, Dressler, and Tallent discussed it at the time. Stewart did not discuss the incident with anyone else and did not report anything to her manager (Adams) or to Human Resources.

Stewart cannot recall any PSSI supervisors making derogatory comments about Stewart taking time off for surgery or physical therapy, and she was never refused time off. (Doc. 18-1 at 25-38). However, she asserts that Adams reprimanded her, by email on November 12, 2012, for taking 30-minute lunch breaks instead of an hour and then leaving work 30 minutes early. In that email, Adams directed Stewart to obtain advance approval for any adjustments to her schedule. In the months before her employment was terminated, Stewart had a number of disagreements with other employees. Stewart frequently complained about other employees and Adams believed that Stewart was trying to act like a manager in that Stewart attempted to give directions to her coworkers. Adams believed that Stewart continually raised excuses, avoided responsibility, and disrespected Adams's authority. (Doc. 18, ¶ 20). On November 19, 2012, Adams investigated certain instances of Stewart's behavior and found that she had engaged in rude, disrespectful, unprofessional, and other inappropriate conduct. (Doc. 18-3, ¶ 24). On the same day, Davis and Adams met with Stewart and gave her a Formal Written Warning concerning her continued behavior. They advised her that any further conduct could result in termination. *Id*. Stewart denied all allegations. (Doc. 18-3, ¶ 25).

According to PSSI, after the written warning, Stewart had additional incidents with another employee, and Stewart directed allegedly inappropriate comments towards Tallent, calling her "half-and-half" and "creamy." (Doc. 18-3, ¶ 28). PSSI has presented evidence that Adams viewed Stewart's conduct to be disruptive, confrontational, and disrespectful, and as undermining her authority. (Doc. 18-3, ¶¶ 7-12). Adams ultimately discussed Stewart's behavior with Human

Resources Generalist, Jude Terrones, and they decided to terminate Stewart's employment based on an ongoing pattern of unacceptable behavior. (Doc. 18-3, ¶ 29). Stewart's employment was terminated on December 4, 2012.

Stewart claims that PSSI terminated her employment in retaliation for reporting an allegedly racist comment by Davis to Tallent, in violation of Title VII. She also contends that PSSI interfered with her right to take FMLA leave and terminated her in retaliation for taking leave. Stewart also asserts a state law claim for intentional infliction of emotional distress (IIED).

## II. Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." *Anderson*, 477 U.S. at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. These general summary judgment standards apply to plaintiff's employment claims. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

## III. Analysis

### A. Title VII retaliatory termination claim

Stewart asserts a claim for retaliatory termination under Title VII, based upon her allegation that she "made a complaint to her supervisor about a discriminatory comment regarding

an African American coworker," and "[w]ithin approximately a month, she was subsequently terminated for a reason that was untrue." (Complaint, Doc. 2-1 at 4-5). Title VII makes it unlawful to terminate an employee for engaging in a protected activity. A plaintiff proves a Title VII violation "either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). In the absence of direct evidence of discriminatory intent, the Court must analyze the evidence under *McDonnell Douglas*. *Riser v. QEP Energy*, 776 F.3d 1191, 1199-1200 (10th Cir. 2015).

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of retaliation. The plaintiff's burden at the prima facie stage requires only a "small amount of proof necessary to create an inference" of discrimination or retaliation, by a preponderance of the evidence, and the burden is "not onerous." *Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)). If the plaintiff meets her prima facie case, then the defendant "must offer a legitimate, non-retaliatory reason for [its] employment action" against the employee. *Vaughn v. Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008) (quoting *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006)). This burden is "one of production, not of persuasion." *Smothers*, 740 F.3d at 539 (quoting *E.E.O.C. v. Horizon / CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000)).

Assuming the employer meets the burden of showing a non-retaliatory reason for the adverse employment action, then the plaintiff may defeat summary judgment only by showing that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual – i.e., unworthy of belief." *Randle v. City of Aurora*, 69 F.3d 44,

451 (10th Cir. 1995). Pretext can be shown by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-[retaliatory] reasons." *Vaughn*, 537 F.3d at 1153 (quoting *Rivera v. City & Cty. Of Denver*, 365 F.3d 912, 925 (10th Cir. 2004)).

To establish a prima facie case of retaliation, the plaintiff must produce evidence to show that (1) she engaged in a protected activity; (2) she suffered a material adverse action; and (3) there was a causal connection between the protected activity and the adverse action. *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015); *see also Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). Stewart's employment was terminated, which is an adverse employment action satisfying the second element.

In support of the first element – that she engaged in protected activity – Stewart asserts that she perceived Davis's instruction to Tallent, to stop using a hallway leading to patient rooms, as racist, and there was apparently some discussion about the comment with Dressler and Tallent at the time it was made:

> Q. There's a statement in [a document submitted to the EEOC] that . . . "About a month or less before I was terminated, I reported a discriminatory comment made to an African American coworker, Lori Tallent, by our supervisor, Susie Davis." Did I read that correctly?
>
> A. Well, I reported it to Kelly Dressler. We were all – Dressler. We were all there, but it was not a formal – I didn't write it. We talked about it.

(Doc. 26-3 at 43:16-24, cited in Doc. 26 at 7, ¶ 5). However, Stewart admitted that she did not report it to anyone within her supervisory chain or to Human Resources, and she did nothing further than the discussion with Tallent and Dressler:

5

> Q. When – when you heard this – this comment, what did you do, other than in the immediate aftermath, talking to these two people about it, Lori [Tallent] and Kelly [Dressler]?
>
> A. We just kind of all looked at each other, didn't know what was going on. We didn't do anything in particular. We just thought it a very strange comment, at least I did.
>
> Q. And did you bring it to anyone else's attention after it occurred?
>
> A. I don't have any recollection of bringing it, no.
>
> Q. And so I take it, you didn't – you didn't make a report under the company Human Resources policies that you felt that there had been a racist comment made to or about Lori Tallent or ask that it be investigated?
>
> A. I did not. I'm not sure what Lori did, though.
>
> Q. And I take it that you did not make a report to any of your people that were in your supervisory chain of command?
>
> A. I did not. Lori may have. I don't know. . . .
>
> Q. Okay. And you're saying that you and Kelly and Lori all talked about the comment, correct?
>
> A. I recall some – yes, us talking. I don't remember details. It's been too long.
>
> Q. . . . I take it that you did not submit a report saying, "I believe that this racist comment was made about Lori Tallent, I would like for it to be investigated."
>
> A. I did not.
>
> Q. And I take it other than the conversation you had between yourself and Lori and Kelly, you did not, as you testified earlier, take it up the chain of your command?
>
> A. I didn't.
>
> Q. To Christine [Adams] or anybody else, correct?
>
> A. I did not.

(Doc. 26-3 at 41-45).

While "no magic words are required" in order to qualify as protected opposition to discrimination, in order to qualify as protected speech, "the employee must convey to the employer his or her concern that the employer has engaged in [an unlawful] practice." *Hinds v. Spirit / United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). Plaintiff's evidence does not indicate that she conveyed any concern about unlawful practices, and she has accordingly failed to present evidence sufficient to create an issue of fact on the "protected activity" element. *See id.* (emails that did not mention or allude to discrimination were not protected activity).

Even if the vague discussion between Stewart, Dressler, and Tallent (as described by Stewart) were sufficient to constitute "protected activity," Stewart cannot establish a causal connection between any purported protected activity and the adverse action. To establish a causal connection between the protected activity and the adverse employment action, Stewart must present evidence of circumstances that justify an inference of retaliatory motive. *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (citation omitted). That requires that plaintiff "first come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire [her] had knowledge of [her] protected activity." *Hinds*, 523 F.3d at 1203; *see also Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) ("To satisfy [the causation] element, a plaintiff must show that the individual who took adverse action against [her] knew of the employee's protected activity."); *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188-89 (10th Cir. 2002) ("An employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition."). It is undisputed that Stewart did not report Davis's comment to Human Resources or to Adams or do anything else. Because the PSSI employees who made the decision to terminate

7

Stewart – Adams and Terrones – did not know of any alleged protected Title VII-related activity, they could not, as a matter of law, have terminated Stewart *because of* any such activity.

Accordingly, Stewart has not satisfied the elements of her prima facie case of unlawful retaliation under Title VII. Even assuming she had, she has not presented evidence that would show pretext, as will be discussed in the following section.

    **B.    FMLA retaliation claim**

For her FMLA retaliation claim, Stewart alleges that PSSI terminated her employment in retaliation for her exercise of rights under the FMLA. (Complaint, Doc. 2-1 at 4). FMLA retaliation claims are subject to the burden-shifting framework of *McDonnell Douglas*. *Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1318 (10th Cir. 2017) (quoting *Metzler*, 464 F.3d at 1170). Thus, plaintiff bears the initial burden of establishing a prima facie case of retaliation by showing that "(1) she engaged in a protected activity; (2) [employer] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." *Id.* (quoting *Metzler*, 464 F.3d at 1170-71).

Plaintiff engaged in a protected activity: she took FMLA leave from July 20, 2012 to August 13, 2012 to have knee surgery. Defendant took an adverse action against plaintiff by terminating her employment on December 4, 2012. Thus, the first two elements of plaintiff's prima facie claim are established. With respect to the third element, a requisite causal connection may be established by "'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239-40 (10th Cir. 2004) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir. 1999)). The "critical inquiry" at this prima facie stage is "'whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an

inference of unlawful discrimination.'" *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (quoting *Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1221 (10th Cir. 2002)). Courts have repeatedly "recognized temporal proximity between protected conduct and termination as relevant evidence of a causal connection sufficient to 'justify an inference of retaliatory motive.'" *Metzler*, 464 F.3d at 1171 (citing *Haynes*, 456 F.3d 1215, 1228 (10th Cir. 2006)). To give rise to an inference of retaliatory motive, temporal proximity between adverse action and protected activity must be very close in time. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (three-month period is insufficient to establish causation standing alone). One and one-half months between protected activity and adverse action may support causation. *Id.* (citing *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584 (10th Cir. 1994)).

Stewart returned to work on August 13, 2012, almost four months before PSSI terminated her. However, Stewart has presented evidence that she continued to exercise intermittent rights under FMLA for physical therapy until November 1, 2012. (Doc. 26-3 at 33-34). Her termination just over a month later could be sufficient to show a causal connection. *See Ramirez*, 41 F.3d 584. While Stewart's evidence is not particularly strong, the Court will assume that plaintiff has met her burden to show a prima facie case by virtue of temporal proximity.

Under *McDonnell-Douglas*, defendant must articulate a legitimate, non-retaliatory reason for the employment action. *Metzler*, 464 F.3d at 1172 (citing *Doebele v. Spring/United Mgmt. Co.,* 342 F.3d 1117, 1135 (10th Cir. 2003)). This burden is one of production, not of persuasion, and it can involve no credibility assessment. *Doebele*, 342 F.3d at 1135 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000)). PSSI has provided abundant evidence that Adams, who was Stewart's manager, believed Stewart was unprofessional, disrespected coworkers, and caused disruptions in the workplace through her

9

conflicts with other employees. (*See, e.g.,* Doc. 18-2, 18-3, 18-15). For example, in October 2012, Adams counseled Stewart on her "abrupt, disrespectful and rude behavior directed toward her co-workers, interfering with [her] supervisory authority and that of Davis by instructing co-workers on what she believed to be their job duties, and telling co-workers what they should and should not be doing, as if she were the manager." (Doc. 18-3, ¶ 7). One co-worker emailed Davis and Adams about Stewart's disrespectful and rude behavior towards her on October 11, 2012. (Doc. 18-6). Adams was informed of another incident where Stewart verbally confronted another employee. (Doc. 18-3, ¶ 10). Stewart frequently complained about other employees, and at times included those other employees on complaints – which Adams found to be inappropriate. (*See, e.g.,* Docs. 18-11, 18-12). On November 19, 2012, Adams documented additional instances of Stewart's behavior toward co-workers. (Doc. 18-15). Adams gave Stewart a Formal Written Warning and advised Stewart "if [she] can't treat co-workers with respect then termination could be the result." (*See* Doc. 18-3, ¶ 24; Doc. 18-17). Stewart's behavior did not improve, and Adams and Terrones decided to terminate Stewart's employment.

To overcome the legitimate, non-retaliatory reason, Stewart must show that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual – i.e., unworthy of belief." *Randle,* 69 F.3d at 451. "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Morgan.,* 108 F.3d at 1323. This inquiry requires courts to "look at the facts as they appear to the person making the decision to terminate, not the aggrieved employee." *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) (quoting *Green v. New Mexico*, 420 F.3d

1189, 1191 n.2 (10th Cir. 2005)). "The relevant inquiry is not whether [its] proffered reasons were wise, fair or correct," but rather whether PSSI believed those reasons to be true and "acted in good faith upon those beliefs." *Rivera v. City and Cty. of Denver,* 365 F.3d 912, 924-25 (10th Cir. 2004). If "a plaintiff demonstrates that an employer's proffered reasons are 'unworthy of credence,' a jury may 'infer the ultimate fact of discrimination' or retaliation." *Smothers,* 740 F.3d at 546 (quoting *Swackhammer v. Spring/United Mgmt. Co.,* 493 F.3d 1160, 1167 (10th Cir. 2007)). However, "[m]ere conjecture that the employer's reason is pretext . . . will not defeat a motion for summary judgment." *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997).

To show pretext, Stewart asserts that PSSI did not follow its internal discipline policy and that this is enough to show pretext. PSSI's progressive discipline policy starts with coaching the employee, then progresses to a written reminder, followed by a final warning, and then termination. (Doc. 26-13, at 7). However, the discipline policy includes that "[s]ome offenses may be so serious that they warrant skipping steps of the disciplinary process up to termination." *Id.* PSSI has documented instances of coaching, a Formal Written Warning, and other counseling it provided Stewart, and Stewart's arguments do not support her pretext argument.[1]

### C. Interference with FMLA

To establish an FMLA interference claim, Stewart must show that (1) she was entitled to FMLA leave, (2) some adverse action by employer interfered with her right to leave, and (3) the

---

[1] Stewart cites *Wilbanks v. Nordam Grp., Inc.*, No. 09-CV-572-CVE, 2010 WL 4272581 (N.D. Okla. Oct. 25, 2010) in support of her pretext argument. However, the court in *Wilbanks* stated, "Although Nordam has a progressive disciplinary policy that typically advances from verbal warning to written warning to final warning to termination, . . . the policy does not require that every employee disciplinary action proceed through all of the steps." *Id.* at n.25. The court thus found that the plaintiff's pretext argument on that policy was not persuasive. *Id.* It is only where the violation of such a policy amounts to a "disturbing procedural irregularity" that it may give rise to an inference of discrimination. *See, e.g., Timmer v. U.S. Bank*, 483 F.3d 1106, 1122 (10th Cir. 2007); *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686 (10th Cir. 2008).

adverse action was related to the exercise or attempted exercise of plaintiff's FMLA rights. *Metzler*, 464 F.3d at 1180. The evidence supports the first element, but Stewart has not presented evidence that supports the second or third elements.

"In order to satisfy the second element of an interference claim, the employee must show that she was prevented from taking the full 12 weeks of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1283, 1287 (10th Cir. 2007). Stewart took FMLA leave from July 20, 2012 to August 13, 2012 for knee surgery. (Doc. 26-3 at 25-30). She ended physical therapy for her knee on November 1, 2012. (*Id.* at 34-36). Stewart does not remember any derogatory comments about taking leave (*id.* at 26-27), and she acknowledges that she was never refused time off for her appointments or prevented from taking any leave. (*Id*. at 37-38). From January 1, 2012 through January 21, 2015, seventeen PSSI employees took FMLA leave and were still employed through that date. (Doc. 18-3, ¶ 4).

In her response, Stewart argues that "the plaintiff has previously discussed the relationship between her attempt to exercise rights under the FMLA and her termination, satisfying the third element of her claim." (Doc. 26 at 25). The only evidence she cites is an email in which Adams stated, "I do not remember authorizing you to take 30 minute lunches and leave at 4:30? If you have to adjust your time to accommodate one of the physicians then that's approved. Otherwise, I need to you [sic] to take your hour lunch." (Doc. 18-14). That email refutes, rather than supports, Stewart's claim of interference, as it establishes that PSSI directed Stewart not to unilaterally adjust her hours without approval, but indicated that she would be permitted time for medical appointments, upon notice and approval. In any event, the November 12, 2012 email was sent

*after* Stewart completed physical therapy and intermittent FMLA leave, such that it could not have interfered with Stewart's exercise of FMLA, which had already ended.

### D. Intentional infliction of emotional distress

Intentional infliction of emotional distress (IIED) is governed by the narrow standards set forth in the Restatement Second of Torts, § 46. *Gaylord Entm't Co. v. Thompson*, 958 P.2d 128, 149 (Okla. 1998). In *Breeden v. League Servs. Corp.*, 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained:

> Liability has been found only were the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

*Id.* at 1376 (quoting Restatement (Second) § 46, cmt. d).

To establish a claim, the plaintiff must show that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *See Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158, 175 (Okla. 2008) (quoting *Comput. Publ'ns, Inc. v. Welton*, 49 P.3d 732, 735 (Okla. 2002)). The trial court must assume a "gatekeeper role" and make an initial determination that the alleged conduct "may be reasonably regarded as sufficiently extreme and outrageous" to maintain a claim for intentional infliction of emotional distress. *Trentadue v. United States*, 397 F.3d 840, 856 n.7 (10th Cir. 2005); *see also Gaylord*, 958 P.2d at 149.

Stewart asserts that her allegations of retaliation and interference are sufficient to state a plausible claim for IIED. The Court disagrees. Stewart has not provided evidence of any facts

that would rise to the level of outrageousness required to maintain an IIED claim under Oklahoma law, because the conduct alleged is not "so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *See Breeden*, 575 P.2d at 1376. Oklahoma courts have routinely held that Title VII and other employment-related claims generally do not rise to the level of outrageous conduct necessary to support a claim of intentional infliction of emotional distress. *Daniels v. C.L. Frates & Co.*, 641 F. Supp. 2d 1214, 1218 (W.D. Okla. 2009); *see also Miner v. Mid-America Door Co.*, 68 P.3d 212 (Okla. Civ. App. 2003) (claim of intentional infliction of emotional distress was not established despite allegations of sexually explicit verbal abuse and physically threatening conduct by a supervisor); *Eddy v. Brown*, 715 P.2d 74 (Okla. 1986) (allegations of ridicule by supervisor and foreman did not amount to sufficiently outrageous conduct); *Anderson v. Oklahoma Temp. Servs., Inc*, 925 P.2d 574 (Okla. Civ. App. 1996) (six events including lewd remarks about the plaintiff by her supervisor and embarrassing her by discussing her faults with coworkers were insufficiently outrageous); *Mirzaie v. Smith Cogeneration, Inc.*, 962 P.2d 678 (Okla. Civ. App. 1998) (allegations that employer made derogatory sexual comments about plaintiff's fiancée, refused to allow plaintiff a day off of work to be with his wife and newborn son in the hospital, and called plaintiff in the middle of the night, browbeating the plaintiff for hours and requiring him to do unnecessary work, were not sufficiently outrageous to maintain a claim for intentional infliction of emotional distress).

## IV. Conclusion

For the foregoing reasons, PSSI's motion for summary judgment (Doc. 18) is **granted**. A judgment will be entered forthwith.

SO ORDERED this 26th day of September, 2017.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE

14